**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

JOSEPH KENNETH NEWBOLD,      )
                                )
              Petitioner,    )
                                )
                  v.          )     1:08CV698
                                )     1:05CR262-1
UNITED STATES OF AMERICA,   )
                                )
              Respondent.    )

## ORDER, MEMORANDUM OPINION AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

Petitioner Joseph Kenneth Newbold, a federal prisoner, has filed a motion to vacate, set aside, or correct sentence pursuant to 28 U.S.C. § 2255. (Docket No. 39.)[1] Petitioner was originally indicted for one count of distributing 5.3 grams of 5-Methoxy-alpha-methyltryptamine (5-MeO-AMT), a Schedule I controlled substance analogue, in violation of 21 U.S.C. § 841(a)(1), one count of distributing 468.1 grams of marijuana in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(D), four counts of money laundering in violation of 18 U.S.C. § 1956(a)(3)(B), and one count of possession of firearms after a felony conviction in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). (Docket No. 10.) Petitioner later pled guilty to the 5-MeO-AMT charge, one of the money laundering charges, and the firearm charge. (Docket Nos. 14, 15.) He was sentenced to 225 months of imprisonment on each charge, with all sentences to run concurrently. (Docket No. 24.)

---

[1] This and all further cites to the record are to the criminal case.

Petitioner did pursue a direct appeal, but was not successful. (Docket Nos. 34, 35.) Petitioner then brought the present motion to vacate. Respondent has responded seeking to have the motion denied (docket no. 55), and Petitioner has filed a reply (docket no. 61). Therefore, the § 2255 motion is now before the Court for consideration on the merits. There are also two other pending motions. At the same time as he submitted his motion under § 2255, Petitioner also filed a motion to disqualify the United States Attorney's Office for this District from handling his § 2255 motion. (Docket No. 42.) Also, Petitioner has filed a motion seeking to file a reply brief in support of his § 2255 motion which exceeds the normal page limitation for such briefs. (Docket No. 60.)

## FACTS

In order to facilitate a proper discussion of Petitioner's claims and motions, it is first necessary to set out portions of his personal history, as well as the facts that led directly to the charges in this case. Petitioner has a long history of interaction with drugs, guns, and court systems. In 1979, during his sophomore year of college, Petitioner was charged with having alcohol and a firearm in his dormitory room, with possessing with intent to sell marijuana and lysergic acid diethylamide (LSD), with having 600 Diazepam tablets in his dormitory room, and with attempting to manufacture lysergic acid. Petitioner entered guilty pleas and received short or suspended prison sentences. (Presentence Report

-2-

(PSR) ¶¶ 60-62.)[2]  Two years later, in 1981, Petitioner was again arrested on gun and drug charges, including charges of possession with intent to distribute methaqualone and LSD.  Petitioner was sentenced to six to ten years of imprisonment, but was paroled a little over a year later.  (PSR ¶¶ 64-65.)  In 1983, he was again arrested for multiple controlled substance charges, including one charge of felony possession with intent to manufacture, sell, and deliver a Schedule II controlled substance.  Petitioner pled guilty and was sentenced to ten years of imprisonment.  (PSR ¶¶ 66-68.)  During that same time period, Petitioner was indicted in this Court for conspiracy to distribute LSD and for distribution of LSD.  He pled guilty and was given two consecutive five-year prison sentences.  (PSR ¶ 69.)  Petitioner completed his state sentence in August of 1990 and was released to serve his federal sentence.  He was paroled from his federal sentence in August of 1991, had his parole revoked in 1993 following a driving while impaired conviction, was re-paroled in late 1993, and completed his parole in June of 1999 despite another driving while impaired conviction in 1996.  (PSR ¶¶ 68-71.)

Following the 1996 driving while impaired conviction, Petitioner managed to avoid further brushes with the law until the instant offenses.  The investigation that led to Petitioner's most

---

[2]As will be discussed in more detail below, the PSR actually states that Petitioner was caught with LSD, but charged with possessing with intent to sell lysergic acid, not LSD.  This is incorrect according to the 1979 indictment which clearly shows that he was charged with possession with intent to sell and deliver LSD.  Also to be discussed more later is the exact nature of the charges to which Petitioner pled guilty.

recent charges was begun by state and local law enforcement in 2004.[3]  Eventually, they were joined by federal agents from the Internal Revenue Service.  Using a confidential informant, two undercover agents were introduced to Petitioner.  They purchased one pound of marijuana and fifty gel capsules of 5-MeO-AMT from Petitioner for $1,250.  This undercover buy led to a number of other under cover buys of marijuana and 5-MeO-AMT over a period of time.  During the meetings with Petitioner, he told the agents various things about the 5-MeO-AMT.  He described it as being like "ecstasy," "mushrooms," and "typtamine."  He also warned the agents that the Drug Enforcement Administration had shut down distributers of the chemicals used to make the drug and that the Federal Analogue Act stated that a drug would be treated as a banned drug if it was sold for human consumption and had an effect similar to a banned drug.  He told the agents that they should claim the pills were vitamin pills if they were stopped by law enforcement.

Petitioner spoke extensively with the undercover agents about his drug dealing.  He asked them about obtaining Oxycontin pills because he had only 900 left.  He told them that he had sold 30,000 Valium pills, that he buried marijuana in ammunition containers around his property, that he had been selling marijuana for ten years, that he had several persons selling marijuana for him and that one sold at least three pounds a week, that he was selling 300 to 400 Oxycontin pills a month, that he was interested in buying

_____

[3]The remaining facts are set out in the PSR at ¶¶ 4-37.

-4-

heroin because he could sell 300 bags a week for $5 profit each, and that he stored various weapons and ammunition around his house even though he knew he was not supposed to have them due to his prior felony convictions.

Petitioner also discussed a great many other illegal actions and dealings involving money laundering, document fraud, and tax evasion. He related that he studied tax codes in prison and explained how to set up shell corporations and produce gun permits to make guns untraceable. He stated that his goal was to acquire at least $20,000 in assets each year, that he was meeting his goal, and that he earned $80,000 a year at his "real" job and $50,000 selling marijuana. Eventually, he laundered what he believed was $50,000 of the agents' drug proceeds using a series of transactions that involved shell corporations and Petitioner's employer, First Medica, Inc. The money was provided to Petitioner as a "loan," which was then laundered and paid back with interest. During the exchanges of the cash, he showed them a snub-nosed .44 Special revolver that he carried in the trunk of his car.

On July 12, 2005, a number of search and seizure warrants were issued involving Petitioner's properties and financial accounts. A search of his residence led to the recovery of marijuana from various places in the residence, as well as eight firearms. Petitioner was arrested on July 13, 2004 with the .44 revolver in his trunk and a small amount of marijuana on his person.

## PETITIONER'S CLAIMS

Petitioner raises eleven potential grounds for relief in his motion. Petitioner's first three claims are all aimed at his sentencing. The initial claim argues that Petitioner should not have been classified as either an armed career criminal or as a career offender at sentencing. He raises various arguments in support of these contentions. Petitioner's second claim alleges that Respondent failed to prove Petitioner's offense level, criminal history, and certain enhancements at sentencing. In his third claim, Petitioner focuses on three of his prior state convictions and asserts that they should not have been counted in his criminal history because he was deprived of his right to appellate counsel by the state courts.

Petitioner changes direction with his fourth claim for relief by arguing that the judge should have recused himself due to bias stemming from news articles related to Petitioner's 1984 convictions in federal court. Then, in his fifth claim, he alleges that the judgment in the case improperly ordered the forfeiture of eight firearms that belong to persons other than Petitioner. His sixth claim alleges that the government breached his plea agreement, while his seventh claim states that the indictment in the case did not state the proper elements of an offense as to the 5-MeO-AMT count.

Petitioner's eighth claim raises an argument that the Second Amendment of the United States Constitution protected Petitioner's right to possess firearms in his home even though he was a

-6-

convicted felon. His ninth claim, which is related to his eighth, claims that recent Second Amendment case law means that an earlier change in North Carolina law regarding felons possessing firearms constitutes a prohibited ex post facto law.

Petitioner's last two claims are both based on ineffective assistance of counsel. In his tenth claim for relief, he alleges that counsel failed to raise certain of the earlier claims during the course of the trial and sentencing. He also adds that his attorney improperly failed to make several other arguments in his favor at sentencing. Petitioner's eleventh claim for relief focuses on his appeal and claims that counsel provided ineffective assistance of counsel on appeal by not raising claims one through seven, as set out above, on appeal.

**OTHER PENDING MOTIONS**

Before addressing Petitioner's claims for relief, the Court must first address the other pending motions. The first of these is a motion by Petitioner to exceed the ordinary page limit in filing his reply brief in support of his § 2255 motion. (Docket No. 60.) Petitioner has submitted that proposed reply brief. (Docket No. 61.) This case is somewhat complex and involves a large number of claims. Given that the parties have been allowed to file extra-length briefs throughout the case, there is no reason why this would not also be allowed for Petitioner's reply brief. Therefore, his motion to exceed the page limitation is granted and his reply brief will be accepted.

The second pending motion, other than the § 2255 motion, is a motion by Petitioner to disqualify the United States Attorney's Office in this District from handling his § 2255 motion. (Docket No. 42.) Petitioner makes an allegation that an agent for the Federal Bureau of Investigation (FBI) who works in this District was a close personal friend of Jeff Drometer, one of the officers at First Medica. Petitioner claims that Drometer and the agent engaged in the illegal burglary and surveillance of a man with whom Drometer suspected his wife was having an affair. The agent also is alleged to have gone to parties at Drometer's house, where he drank and used illegal drugs. Petitioner claims that he provided evidence to the United States Attorney's office that Drometer was knowingly involved in laundering the alleged drug proceeds given to Petitioner by the undercover officers. However, that office did not prosecute Drometer or make a motion for Petitioner to receive a sentence reduction based on substantial assistance. Petitioner believes that these decisions were improperly influenced by Drometer's friend in the FBI.

Even if, purely for the sake of deciding Petitioner's motion, the Court were to assume that Petitioner's allegations about the relationship and activities of Drometer and the FBI agent were true, Petitioner could still not prevail on his disqualification motion. Petitioner has produced nothing beyond pure speculation to show that the FBI was involved in this case in any way, much less that one of its agents somehow influenced the case. This case was the product of investigations by state and local law enforcement

-8-

agencies and the IRS, not the FBI. An FBI agent attempting to insert himself into an ongoing investigation and to influence the prosecution decisions of the United States Attorney's Office would have been noticeable to the point that success in that endeavor would have required the knowing cooperation of one or more members of the United States Attorney's Office. Petitioner has submitted his own affidavit and an affidavit from his wife in support of his allegations of the relationship with Drometer and the agent. However, he has provided nothing but speculation concerning the involvement of the United States Attorney's Office in a corrupt conspiracy with the FBI.[4] Speculation is not sufficient to win a motion to disqualify that office. Petitioner's motion to disqualify will be denied.

## DISCUSSION

### Claim One

Petitioner's first claim is that he should not have been sentenced as an armed career criminal because he did not have three prior convictions for "serious drug offenses" as required by the Armed Career Criminal Act (ACCA). The ACCA calls for a mandatory

---

[4]Petitioner has not even suggested a motive for the actions he alleges. It is not clear exactly why he believes that one or more members of the United States Attorney's Office would risk their careers and possibly open themselves to being prosecuted in order to cover up for a corrupt agent and his friend who laundered drug proceeds. Petitioner has also made conflicting allegations on some points. He states in his disqualification motion that an Assistant United States Attorney did not prosecute Drometer because he did not want the agent's corrupt activities to come to light. However, at other points in his pleadings, he alleges that the United State's Attorney's office was never even told of the allegations of corruption by the agent because Petitioner's attorney refused to pass along the information. (Docket No. 39, Supporting Facts, ¶¶ 74-77; Docket No. 62 ¶ 36.) He does not explain how an office can intentionally cover up activities about which it is not informed.

-9-

minimum fifteen-year sentence for persons convicted under 18 U.S.C. § 922(g) who already have three previous convictions for serious drug offenses or crimes of violence. 18 U.S.C. § 924(e)(1). Also, armed career criminal status triggers significant enhancements under the United States Sentencing Guidelines (USSG). USSG § 4B1.4. These enhancements were applied in Petitioner's case and resulted in him being sentenced at an offense level of 31 with a criminal history category of VI. (PSR ¶¶ 55-57.) The PSR applied the enhancement based on what it found to be serious drug convictions obtained by Petitioner on March 13, 1980, January 27, 1981, and April 9, 1981. "Serious drug offenses" under state law are drug offenses involving manufacturing, distributing, or possession with intent to manufacture and distribute controlled substances which carry a penalty of ten years or more of imprisonment. 18 U.S.C. § 924(e)(2)(A)(ii).

Petitioner's primary contention is that the ACCA enhancements should not have been applied because no conviction he received on March 13, 1980 qualified as a "serious drug offense" for ACCA purposes. There is substantial confusion on this point in the records underlying Petitioner's sentencing. The PSR states that Petitioner was selling drugs from his dorm room and that a search of the room uncovered 600 tablets of Diazepam, marijuana, and LSD. However, it lists his charges as being felony possession of the Diazepam, felony possession with intent to sell and deliver marijuana, and felony possession with intent to sell and deliver lysergic acid, not LSD. It states that he pled guilty to those

-10-

charges.  (PSR ¶ 61.)  Likewise, copies of Petitioner's National Crime Information Center (NCIC) report, which were provided to him through his attorney prior to his guilty plea, indicated only a conviction for possession of Diazepam. (Docket No. 55, Attach. 1, Ex. E.)

Petitioner states, and Respondent has not denied, that convictions involving Diazepam, marijuana, and lysergic acid did not carry ten-year penalties under North Carolina law in 1980 because those substances were not Schedule I or II drugs.  He admits, on the other hand, that a conviction for distribution of LSD would have carried a ten-year maximum penalty because it was a Schedule I drug.  The question at this point then is what was the true nature of Petitioner's 1980 convictions.

Respondent has submitted the actual state court documents from the 1980 convictions.  The indictments state that Petitioner was indicted for possession of Diazepam, possession with intent to distribute marijuana, and possession with intent to distribute LSD. The judgment in the case states that Petitioner appeared on "the charge or charges of Possession of Controlled Substance; Possession with intent to sell and deliver controlled substance; (2 cases)" and that he pled guilty to "the offense of possession of controlled substance, possession with intent to sell controlled substance. (2 cases)." (Docket No. 55, Attach. 2.)  These state court records naturally carry greater weight than what are really restatements or summaries found in the PSR or the NCIC report.  It is apparent from the actual records that Petitioner was charged with Diazepam,

-11-

marijuana, and LSD, not lysergic acid, and that he pled guilty to all three charges, not just the Diazepam offense. The LSD conviction did carry a maximum ten-year sentence. Given those facts, it was not erroneous for Petitioner to be sentenced as an armed career criminal based on his having three prior serious drug convictions.[5]

Petitioner also argues in his first claim for relief that he should not have been sentenced as a career offender under USSG § 4B1.1. Although the PSR did note that the career offender enhancement would apply to Petitioner, he was not actually sentenced as a career offender because the enhancement based on his status as an armed career criminal produced a higher Guidelines' level. (PSR ¶¶ 54, 55.) Therefore, the Court need not consider the career offender argument.

Finally, Petitioner challenges the manner in which his prior convictions were proved at sentencing. Citing to Shepard v. United States, 544 U.S. 13 (2005), he argues that Respondent was required to produce the charging documents, written plea agreements, transcripts of plea colloquies or explicit findings by the trial judges in order to support these convictions and the fact that they

---

[5]Petitioner states that he does not have a copy of the plea agreement from the 1980 convictions and that he does not now remember exactly what was written in that agreement. He theorizes that he may have been allowed to plead to a lysergic acid offense as a "lesser included offense" of the LSD charge. (Docket No. 62 ¶ 27.) This argument fails for two reasons. First, it is purely speculative. Second, it is unlikely given that, as Petitioner has pointed out throughout the briefing of this matter, LSD and lysergic acid are separate substances that are scheduled differently under North Carolina law. Possession with intent to distribute one controlled substance is not a "lesser included offense" of possession with intent to distribute a different controlled substance.

qualified as predicate offenses for the ACCA and career offender enhancements. He contends that it was error to rely only on the PSR, which was based in part on police reports and search warrant applications. This argument fails for two reasons. First, although the PSR does rely partly on police reports and search warrants, it also explicitly relied on state court judgments. (PSR ¶¶ 61, 65, 67.) Second, <u>Shepard</u> is inapposite. That case dealt with a situation where a defendant raised a challenge as to whether a particular offense qualified as a predicate based on the elements of the offense. Petitioner raised no such challenge here. His attorney did object to the predicate offenses. However, the objection was based on whether <u>Blakely v. Washington</u>, 542 U.S. 296 (2004), required the sentencing judge to look at the presumptive sentence under North Carolina's Fair Sentencing Act, rather than the statutory maximum, when determining whether the maximum penalty for Petitioner's prior offense was ten years or more. (Docket No. 19 at 9-12.) The attorney also filed objections stating that Petitioner's civil rights had been restored regarding his release from prison and that certain of the predicate offenses were combined and should be treated as one. (<u>Id.</u> at 12-13.) No objection was raised and no evidence was presented on the points now raised by Petitioner. He did not object to either the basic fact of his convictions or to the fact that they carried statutory ten-year maximums. Proof of the nature discussed in <u>Shepard</u> was not required. Instead, the sentencing judge was entitled to rely on the PSR. <u>United States v. Terry</u>, 916 F.2d 157 (4th Cir. 1990).

-13-

All facets of Petitioner's first claim for relief fail and it
should be denied.

## Claim Two

Petitioner's second claim for relief is that he "objected to
and disputed the offense levels, enhancements, recidivist
enhancements under USSG [§]4B1.1 and ACCA, [§]4B1.4 and criminal
history asserted in the PSR, but the United States introduced no
evidence at sentencing sufficient to meet its burden of proof."
(Docket No. 39, Attached Brf. at 3.) This is really an expanded
variation of the last portion of his first claim for relief. It
also fails for essentially the same reasons. Although Petitioner
did raise broad factual objections, the objections that were
briefed extensively and argued at sentencing were legal, not
factual, in nature. Petitioner put on no evidence at sentencing to
contest the factual portions of the PSR. Therefore, the United
States had no obligation to prove the factual portions of the
report and the sentencing judge could rely on the PSR. Terry,
supra. The legal objections that were specifically raised and
briefed were ruled on at sentencing and upheld on appeal.
Petitioner's second claim for relief should be denied.

## Claim Three

Petitioner argues in his third claim for relief that his
predicate convictions from 1980, 1981, and 1984 were all obtained
in violation of his right to counsel. He claims that, following
his guilty pleas in those cases, neither the sentencing judges nor
his attorneys advised him of his right to appeal or to have

-14-

appellate counsel appointed. Petitioner further explains this claim in the briefing of his case. He is not claiming that he had a right to a traditional appeal under North Carolina law. Where a defendant pleads guilty and is sentenced in the presumptive range, such appeals are available, if at all, in very limited circumstances. Petitioner does not claim that he could have met these circumstances.[6] He instead claims that his only avenue of appeal under North Carolina law was to file motions for appropriate relief in the state trial courts and that he had a statutory right to have counsel appointed to represent him in filing those motions. (Docket No. 41 at 16-18.)

Unfortunately for Petitioner, even if motions for appropriate relief were the only manner in which he could have challenged his guilty pleas, his current claim still cannot succeed. This is because motions for appropriate relief are motions for collateral review, not direct appeals under North Carolina law. This was true even at the time of Petitioner's convictions in 1980-84. See State v. Bush, 307 N.C. 152, 165-66, 297 S.E.2d 563, 572 (1982)(discussing 1977 change in North Carolina law to set up motion for appropriate relief standards and procedures as the methods for collateral attacks on convictions in North Carolina). Any right to counsel that Petitioner may have had in pursuing such motions was a statutory right under North Carolina law. There is no federal constitutional right to counsel on collateral review.

_____

[6]In fact, Petitioner denies that these exceptions applied at all at the time of his early convictions. (Docket No. 62 ¶ 14.)

-15-

Coleman v. Thompson, 501 U.S. 722, 756–57 (1991). Therefore, his prior convictions were not obtained in violation of a federal right to counsel. Petitioner's third claim for relief should be denied.

## Claim Four

Petitioner's fourth claim for relief contends that the judge who took his plea and presided over his sentencing should have recused himself. Petitioner supports this claim by pointing to an exchange between the judge and the parties which occurred at the end of Petitioner's change of plea hearing. After accepting Petitioner's guilty pleas, the judge explained the sentencing process to Petitioner. He then informed Petitioner's attorney that, as a long-time resident of the area, he remembered newspaper articles connected to Petitioner's prior federal conviction. He stated, "I didn't remember exactly what it was, but I remember that conviction, and I remember that Mr. Newbold had difficulty." (Docket No. 38 at 27.) The judge went on to tell Petitioner's attorney that he wanted someone to explain at sentencing why Petitioner, who he described as a reasonably intelligent person, would get back into a life of crime after his release from federal prison on the earlier charges.

Petitioner has produced affidavits from his parents indicating that between eight and ten articles were written around the time of the 1984 federal charges. The articles stated that federal agents were keeping a witness in protective custody because of threats by Petitioner, that Petitioner was the leader of an eight-person drug distribution conspiracy, and that Petitioner directed the

-16-

operations of the conspiracy from within the state prisons. (Docket No. 39, Ex. I. ¶ 7 and Ex. J. ¶ 7.) Petitioner contends that the information contained in these articles biased the judge against him at sentencing. He believes that the judge should have recused himself.

Recusal is required only where "'another with knowledge of all of the circumstances might reasonably question the judge's impartiality.'" United States v. Cherry, 330 F.3d 658 (4th Cir. 2003)(quoting In re Beard, 811 F.2d 818, 827 (4th Cir.1987)). Where bias is alleged based on an "extrajudicial source," "'the alleged bias and prejudice to be disqualifying must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case.'" Liteky v. United States, 510 U.S. 540, 545 n.1 (1994)(quoting Berger v. United States, 255 U.S. 22, 31 (1921)). Further, the opinion must be "wrongful or inappropriate, either because it is undeserved, or because it rests upon knowledge that the subject ought not to possess . . . or because it is excessive in degree." Id. at 550. The mere reading of a newspaper article, even if upsetting or concerning to a judge, does not necessarily create a "measurable level of prejudice." Judges are experts at "closing their eyes and ears to extraneous or irrelevant matters and focusing only on the relevant in the proceedings in front of them." United States v. Scarfo, 263 F.3d 80, 94 (3d Cir. 2001).

Here, the judge merely noted that he remembered seeing a news article nearly twenty years before. He did not state that he

-17-

remembered any prejudicial or damaging facts that may have been in
articles from that time period. In fact, he explicitly stated that
he only remembered that Petitioner had a prior conviction and
"difficulty." It appears that he did not remember the details that
now concern Petitioner. Further, nothing in the judge's statement
indicated that his memory of the article unfairly prejudiced him
against Petitioner. Instead, the reason for his even raising the
matter was to let defense counsel know that he was already aware of
a prior federal conviction[7] and that he would be considering at
sentencing the question of why Petitioner returned to a life of
crime. This is not in any way an inappropriate consideration. In
fact, it relates to several of the factors that a sentencing judge
must consider under 18 U.S.C. § 3553(a). The judge's comment was
aimed at helping Petitioner prepare for sentencing--it did not
indicate bias or prejudice. Petitioner's fourth claim for relief
should be denied.

### Claim Five

Petitioner's fifth claim for relief alleges that the
sentencing judge improperly ordered the forfeiture of the eight
firearms seized from Petitioner's residence during the search of
those premises. Petitioner states in his pleadings that he is not
attempting to have the firearms returned to him. Nor does he
assert that he has any legal ownership interest in those firearms.
He states that they belong to his son and mother-in-law. Indeed,
Petitioner cannot have an ownership interest due to his status as

---

[7]A fact that he would have eventually seen in the PSR in any event.

a convicted felon.  He seeks to have the forfeiture order vacated to ease the alleged owners' path in reacquiring the guns.

This claim easily fails.  No matter how he construes his claim, Petitioner is raising a claim for the legal benefit of others.  While Petitioner's claim may advance a moral or personal interest that he may have in seeing that the firearms are returned to their owners, it does not further his legal interests in any way.  It has long been the rule that a litigant cannot advance legal claims on behalf of other persons.  <u>Warth v. Seldin</u>, 422 U.S. 490, 509 (1975).  Petitioner has no standing to litigate the interests of the alleged owners of the affected firearms.  His fifth claim for relief should be denied.

## Claim Six

Petitioner's sixth claim for relief alleges that Respondent breached his plea agreement in two ways.  First, by using a conviction not listed on the NCIC report to sentence him as an armed career criminal and, second, by holding him accountable for 117 grams of 5-MeO-AMT, instead of the 5.3 grams that were stated in the plea agreement to be involved in the drug distribution count.

"[W]hen a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." <u>Santobello v. New York</u>, 404 U.S. 257, 262 (1971).  Where the contents of a plea bargain are at issue, courts will apply the traditional principles of contract.  <u>United States v. McIntosh</u>, 612

-19-

F.2d 835 (4th Cir. 1979). Unless the agreement is ambiguous, parol evidence is inadmissible to vary the terms of an otherwise definite agreement. Hartman v. Blankenship, 825 F.2d 26, 29 (4th Cir. 1987).

Petitioner's first contention is that his plea agreement was breached because a conviction not listed on the NCIC report was used to enhance him as an armed career criminal. There is no question that the NCIC report was not a physical part of the Petitioner's written plea agreement. Nor was any mention of the NCIC report made in the agreement. Petitioner does not argue otherwise. Instead, he maintains that it was important to him that he not be subjected to the ACCA penalties as a part of his plea agreement. Therefore, he asked for, and received, a copy of his NCIC report prior to pleading guilty. He states that the report was provided to his attorney by Respondent and that his attorney discussed the report with him. He maintains that, because Respondent knew that he was reviewing the report in order to determine whether the ACCA applied and whether or not to plead guilty, the report itself became a "factual representation about [the] consequences of [his] plea." (Docket No. 62 ¶ 22).

The problem for Petitioner is that, if the NCIC report was a factual representation at all, the representation was very limited. In fact, there is no sign that the representation was anything other than one that the report given was the report Petitioner requested. There is no evidence that Respondent ever represented that the report constituted a full and accurate statement of

-20-

Petitioner's record, that any convictions not listed in the report could not be used at sentencing, or that the ACCA would not apply at sentencing. In fact, the plea agreement itself stated that the ACCA penalties would apply if it was determined "at the time of sentencing" that Petitioner had the necessary predicate convictions. (Docket No. 14 ¶ 2(f).) Nowhere does it state that this determination will be based entirely on, or limited by, the convictions set out in the NCIC report. Further, and more importantly, when the judge accepting Petitioner's guilty plea did not initially advise Petitioner that the ACCA penalties could apply, the prosecutor interrupted to ask that the judge read the ACCA penalty because the ACCA penalties would apply. (Docket No. 38 at 13.) Whatever occurred in Petitioner obtaining the NCIC report, he knew at the time he pled guilty that it was the explicit representation of the prosecutor that the ACCA would apply. The report was in no way a promise that it would not.

It may well be that Petitioner believed that the prosecutor was wrong and that the ACCA would not apply. This may have even been a reasonable belief based on the NCIC report. However, the "contract" of the plea agreement is defined by the terms of that document and the representations of the parties, not Petitioner's unexpressed belief that the opposing party's representation was mistaken. Here, the plea document and Respondent's explicit representation stated that the ACCA could and would apply to Petitioner. It is not a breach of the plea agreement that they

-21-

later turned out to be correct.  The first portion of Petitioner's claim fails.

Petitioner's second breach of the plea agreement argument is also unsuccessful.  He claims that Respondent breached the plea agreement because the agreement stated that 5.3 grams of 5-MeO-AMT was involved in the offense to which he pled, but 117 grams of the drug was attributed to Petitioner for sentencing purposes in the PSR.  It should be noted initially that Petitioner's sentence was determined by ACCA enhancement.  The drug amount played no part in his eventual sentence.  (PSR ¶¶ 45, 55.)  In any event, the plea agreement did not bind Respondent to the 5.3 grams of 5-MeO-AMT at sentencing.  It stated only that the amount "involved in the offense alleged in Count One of the Indictment" was 5.3 grams. (Docket No. 14 ¶ 5(b).)  No representation was made regarding the total amount for which Petitioner could be held accountable at sentencing.  The agreement also explicitly reserved the rights of both parties to "bring to the Court's attention any facts deemed relevant for purposes of sentencing." (Id. ¶ 7.)  Certainly, drug amounts are relevant conduct under the sentencing guidelines. Therefore, the use of 117 grams of 5-MeO-AMT at sentencing was not a breach of the plea agreement.  Petitioner's sixth claim for relief should be denied.

### Claim Seven

Petitioner's next claim for relief asserts that the indictment did not allege a proper offense as to the 5-MeO-AMT distribution

charge because it did not state what Schedule I substance 5-MeO-AMT is associated with as an analogue. This claim easily fails.

A guilty plea waives non-jurisdictional defects. See Tollett v. Henderson, 411 U.S. 258, 267 (1973). A pleading defect in an indictment is not a jurisdictional defect. United States v. Cotton, 535 U.S. 625, 630-31 (2002). Therefore, Petitioner's guilty plea waived his right to contest any defect in the indictment. Further, the indictment clearly was not defective. The elements of a violation of the Analogue Act are: (1) the alleged analogue and a controlled substance have substantial chemical similarity, (2) actual, intended, or claimed physiological similarity between the alleged analogue and the controlled substance, and (3) intent that the alleged analogue be consumed by humans. United States v. Klecker, 348 F.3d 69, 71 (4th Cir. 2003). These elements are alleged in Count One of Petitioner's indictment using a reference to the appropriate statutory definition. Indictment language tracking the applicable statutory language is ordinarily sufficient to allege an offense. See United States v. Wicks, 187 F.3d 426, 427 (4th Cir. 1999). As Respondent points out, Petitioner could have filed a bill of particulars if the failure to list a specific controlled substance that was similar to 5-MeO-AMT was causing difficulty with his defense. In the end, this claim should be denied for several reasons.

### Claim Eight

Petitioner's eighth claim makes an argument that the United States Supreme Court's decision in the case of District of Colombia

v. Heller, ___ U.S. ___, 128 S. Ct. 2783 (2008), recognized a Second Amendment right to possess firearms in the home for self-defense even for convicted felons. He claims that 18 U.S.C. §§ 922 and 924 violated this constitutional right to the extent that they prevented him from possessing firearms in his home. This argument easily fails. It is true that Heller did recognize an individual's right to possess firearms under the Second Amendment and that it limited governments' ability to abridge that right. However, it is entirely distinguishable from the present case. The plaintiff in Heller was a special police officer seeking a permit to possess a handgun in his own home, not a convicted felon. Id. at 2788. The Supreme Court specifically noted that the opinion should not be taken to cast doubt on prohibitions against felons possessing firearms. Id. at 2816-17. The Fourth Circuit has concluded that, far from casting doubt on the prohibition of the possession of firearms by felons, Heller actually upheld it. United States v. Brunson, 292 Fed. Appx. 259, 261 (4th Cir. 2008). Petitioner's eighth claim for relief should be denied.

### Claim Nine

Petitioner's ninth claim for relief is similar to his eighth in that it relies on Heller. At one time, North Carolina law allowed convicted felons to possess handguns in certain circumstances. However, in 1995, it amended its laws to prevent this. All of Petitioner's felonies occurred well before 1995. In fact, he was last released from prison in 1993, when he was released following a parole revocation. (PSR ¶ 69.) Petitioner

-24-

argued on direct appeal that the application of the 1995 change in law to ban him from possessing firearms was an ex post facto violation. This argument was rejected by the Fourth Circuit based on prior Fourth Circuit precedent which held that the change in North Carolina law was civil, not criminal, in nature. United States v. Newbold, 215 Fed. Appx. 289, 295 (4th Cir.)(citing United States v. Farrow, 364 F.3d 551, 555 (4th Cir. 2004)), cert. denied, ___ U.S. ___, 128 S.Ct. 56 (2007). Petitioner claims that Heller should cause this conclusion to be reconsidered.

Naturally, this Court cannot "reconsider" a holding of the Fourth Circuit. Further, as explained above, Heller left prohibitions on the possession of firearms by felons intact. It also had nothing to do with whether the change in North Carolina law was civil or criminal in nature. In no way could it have called Farrow into question. Petitioner's ninth claim for relief should be denied for all of these reasons.

### Claims Ten and Eleven

Petitioner's final claims for relief involve allegations of ineffective assistance of counsel at the trial and appellate levels. In order to prove ineffective assistance of counsel, a petitioner must establish, first, that his attorney's performance fell below a reasonable standard for defense attorneys and, second, that he was prejudiced by this performance. See Strickland v. Washington, 466 U.S. 668 (1984). Petitioner is not entitled to a hearing based upon unsupported, conclusory allegations. See Nickerson v. Lee, 971 F.2d 1125, 1136 (4th Cir. 1992) (in order to

-25-

obtain an evidentiary hearing a habeas petitioner must come forward
with some evidence that the claim might have merit), _abrog'n on
other grounds recog'd_, _Yeatts v. Angelone_, 166 F.3d 255 (4th Cir.
1999). A petitioner bears the burden of affirmatively showing
deficient performance. _See_ _Spencer v. Murray_, 18 F.3d 229, 233
(4th Cir. 1994). To show prejudice following a guilty plea, a
petitioner must establish that there is a reasonable probability
that but for counsel's allegedly deficient conduct, he would not
have pled guilty but would have gone to trial. _Hill v. Lockhart_,
474 U.S. 52 (1985).

As for appeals, appellate counsel need not raise on appeal
every non-frivolous issue requested by a defendant. _Jones v.
Barnes_, 463 U.S. 745 (1983); _see also_ _Smith v. Murray_, 477 U.S.
527 (1986); _Evans v. Thompson_, 881 F.2d 117, 124 (4th Cir. 1989)
(declaring that counsel pursued sound trial strategy when he
"determined what he believed to be petitioner's most viable
arguments and raised them on appeal"). Winnowing out weaker
arguments to press forward with more important points is part of
effective appellate advocacy. _Jones_, 463 U.S. at 751-52.
Prejudice can be shown by demonstrating that "'counsel omitted
significant and obvious issues while pursuing issues that were
clearly and significantly weaker.'" _Bell v. Jarvis_, 236 F.3d 149,
180 (4th Cir. 2000)(quoting _Mayo v. Henderson_, 13 F.3d 528, 533 (2d
Cir. 1994)).

Most of Petitioner's ineffective assistance claims involve
some of the claims discussed above. For instance, he faults

-26-

counsel for failing to raise the substance of his first seven claims for relief at the trial level or on appeal. As set out above, these claims have no merit. Therefore, counsel did not err in failing to raise them and/or Petitioner was not prejudiced by the fact that they were not raised. His ineffective assistance claims that rely on his earlier claims fail the <u>Strickland</u> analysis and should be denied accordingly.

Petitioner does point to what he claims were additional errors by counsel at sentencing. He states that counsel erred in failing to move to compel a sentencing departure under USSG § 5K1.1 based on Petitioner's attempts to help with the investigation of First Medica and certain of its corporate officers. Petitioner concedes that the filing of a departure motion under § 5K1.1 is ordinarily within the discretion of the government and cannot be compelled absent an unconstitutional motive such as a defendant's race or religion or a decision not rationally related to any legitimate government objective. <u>Wade v. United States</u>, 504 U.S. 181, 186-87 (1992). Still, he attempts to meet this standard by pointing again to the allegedly improper relationship between Jeff Drometer and an FBI agent. Assuming for the sake of argument that these allegations would satisfy the requirements set out in <u>Wade</u>, Petitioner has again failed to demonstrate any connection between the FBI and this case or any relationship between the agent and the prosecutor so that the agent could have influenced the case.[8]

---

[8]Petitioner has introduced an affidavit from his wife, Amy Newbold, stating that she saw Drometer in possession of a copy of a "sealed" affidavit used to
(continued...)

Whatever the agent's relationship with Drometer, Petitioner has provided nothing more than speculation to implicate the prosecutor. In fact, the prosecutor states that Petitioner's attempts at providing substantial assistance failed because he did not provide full and complete details of the alleged crimes. The prosecutor did not believe that he could easily base a case against other individuals solely on the uncorroborated statements of an armed career criminal who was facing a lengthy prison sentence. (Docket No. 55 at 34-35.)[9]

Overall, Petitioner's attorney did not fail him in not attempting to compel a § 5K1.1 motion. There is not sufficient evidence to suggest that the motion would have been anything other than futile. This particular claim should be denied.

Finally, Petitioner alleges that his counsel erred by not asking for a lower sentence within the applicable guideline range

---

[8](...continued)
obtain a search warrant in this case. This allegedly occurred around August 1, 2005. The affidavit is described as being "at least 50 pages long," as giving "every detail of the 12 month investigation," and as containing the name of one of the undercover SBI agents. (Docket No. 39, Ex. S.) Amy Newbold states that Drometer told her he got the affidavit from a friend in "high places." Petitioner contends that this is evidence that Drometer had access to information not available to the public. Actually, several search or seizure warrants were issued in connection with this case, all of which used similar affidavits fitting the general description in Amy Newbold's affidavit. (Case Nos. 1:05MJ592-97.) More importantly, the affidavits in four of the cases were returned and docketed on or before August 1, 2005, making them open to public inspection. (1:05MJ593-595, 1:05MJ597.) Thus, any affidavit that Amy Newbold saw in Drometer's possession was not necessarily a copy of a sealed affidavit.

[9]Petitioner claims that the United States routinely bases prosecutions in drug cases on the testimony of convicted felons. Although such testimony is commonly used, it is normally corroborated in some fashion. It is not the entire case. Petitioner does not point to corroborating evidence that the government could have used against anyone at First Medica.

-28-

based on his general willingness to cooperate, even if that cooperation had not reached the level of substantial assistance. He also faults counsel for not specifically raising such factors as Petitioner's age, the fact that he has a shorter life expectancy due to a chronic Hepatitis C infection, the fact that older offenders have a lower recidivism rate, the fact that the money laundered was not real drug money, the fact that the money was repaid, the fact that "all firearms possessed were in [Petitioner's] home for self-defense," the age of the predicate offenses, and the fact that the undercover agents manipulated the sentencing factors by controlling the amount of drugs and money involved and asking that he carry a firearm to protect the money. Finally, he complains that counsel did not force the sentencing judge to explicitly discuss the factors set out in 18 U.S.C. § 3553 on the record.

The listed arguments set out by Petitioner can be described variously as weak, seeking to avoid personal responsibility, misleading, or out and out false. Starting with the most serious problems, it is false that Petitioner possessed all of the firearms in his home for self defense. He possessed at least one gun, the .44 Special, outside his house to aid him in his crimes. The PSR also states that he told agents he had one of the guns in his home to protect his drug business. (PSR ¶ 38.) Next, he blames the agents for his possession of the .44 Special, but the PSR states that he already had it in his car when the agents first asked how he would protect their money. He also had it in his car at the

-29-

time he was arrested.  He was not protecting any of the agents'
money at that time.  (Id. ¶¶ 28, 37, 38.)

As for the agents controlling the amount of money and drugs
and Petitioner's repayment of the laundered money, it is literally
true that these things did occur.  However, they do not help
Petitioner's case.  The statement concerning the control of the
amounts by the agents belies the truth that Petitioner bragged to
the agents about his extensive drug dealing activities which went
well beyond the conduct directed by the agents.  It was not as if
the agents pushed a small dealer to become a big dealer.  Even the
proposals were a two-way street, as Petitioner asked them about
obtaining significant quantities of pills and heroin for resale.
As for repayment of the laundered money, the repayment occurred
with interest.  (PSR ¶ 25-27, 29, 32.)  However, it occurred as
part of Petitioner's commission of money laundering.  The fact that
he followed through on a criminal act as promised would not have
helped him at sentencing.

Further pointing out Petitioner's age, health, and the age of
his prior convictions also would not have helped.  His age and
health were already set out in the PSR and Petitioner specifically
mentioned his health and potentially shortened life span at
sentencing.  (Docket No. 31 at 45.)  Also, counsel did point out
that he had gotten only one DWI conviction in the time since his
release from federal prison on the 1984 conviction.  (Id. at 21.)
These points were raised sufficiently so that they helped
Petitioner to any extent they could.

As for Petitioner's attempted cooperation, it is quite unlikely that mentioning this matter would have succeeded in obtaining a departure for substantial assistance would have affected sentencing. The sentencing judge informed Petitioner and his counsel at the change of plea hearing that he would be very interested at sentencing in why Petitioner, with all of the potential that he had, had returned to crime after his earlier release from federal prison. Appropriately enough, Petitioner's attorney, and then Petitioner, spent most of the sentencing hearing explaining that to the judge. (<u>Id.</u> at 22-44.) This was a strategic decision of the sort that is to be given great deference in analyzing an ineffective assistance claim. See <u>Strickland</u>, 466 U.S. at 690-91. In light of the sentencing judge's expressed interests, this was a perfectly understandable strategy. There was no reason to discuss a failed attempt at cooperation and it is doubtful that it would have changed matters in Petitioner's favor. His long record and persistence in pursuing numerous criminal activites weighted too strongly against him.

Finally, Petitioner has not even explained how forcing the sentencing judge to discuss each factor listed in § 3553 would have helped his case or changed his sentence. Overall, Petitioner cannot establish either an error by counsel or any prejudice from counsel's approach to sentencing. All of his claims should be denied.

**IT IS THEREFORE ORDERED** that Petitioner's motion to disqualify the United States Attorney's Office (docket no. 42) is denied and

that Petitioner's motion to file an oversized reply brief (docket no. 60) is granted.

**IT IS RECOMMENDED** that Petitioner's motion to vacate, set aside, or correct sentence (docket no. 39) be **DENIED** and that Judgment be entered dismissing this action.


/s/ Donald P. Dietrich
_____
                **Donald P. Dietrich**
        **United States Magistrate Judge**

July 27, 2009